# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| IN RE: TRS RECOVERY SERVICES, INC. AND TELECHECK SERVICES, INC., FAIR DEBT COLLECTION PRACTICES ACT (FDCPA) LITIGATION | ) ) ) ) ) | CIVIL DOCKET NO. 2:13-MD-2426-DBH |

## DECISION AND ORDER ON PROPOSED SETTLEMENT AGREEMENT AND ATTORNEY FEES

This is a consumer class action brought under two federal statutes, the Fair Debt Collection Practices Act and the Fair Credit Reporting Act, as well as Maine consumer protection laws. The plaintiffs complain that TRS Recovery Services, Inc. and Telecheck Services, Inc. sent them a misleading form collection letter, the "RECR3 letter," and improperly collected on disputed or erroneous debts for purportedly returned checks. I have been asked to finally certify settlement classes, approve the settlement, and approve a request for attorney fees. Mot. for Final Approval of Class Action Settlement (ECF No. 123); Mot. for Award of Attorneys' Fees (ECF No. 124). I conducted a fairness hearing and attorney fees hearing on January 21, 2016.

## BACKGROUND

Jean LaRocque filed this action on March 11, 2011, in the District of Maine[1] and moved for class certification on December 15, 2011. I certified three

---

[1] This action was captioned LaRocque ex rel. Spang v. TRS Recovery Servs., Inc., et al., No. 2:11-cv-91-DBH.

classes and denied certification to a fourth class on July 17, 2012.[2]  The certified

classes were as follows:

> Class One:  All natural persons with an address in the State of Maine to
> whom the defendant TRS sent its RECR3 letter between March 11, 2010
> and the present.

> Class Two:  All natural persons with an address in the United States and
> its Territories to whom the defendant TRS sent its RECR3 letter between
> March 11, 2010, and the present, and from whom one or both defendants
> collected in whole or in part, within 30 days of the RECR3 letter, the debt
> or returned check fee referenced in that RECR3 letter.

> Class Three:  All natural persons who have paid a returned check fee of
> $25 to at least one of the defendants by way of a TRS demand draft in
> connection with an underlying check transaction that occurred in the
> State of Maine since March 11, 2005.

The defendants then moved to expand Class One from a class of Maine residents

to a nationwide class, while maintaining their objection to any class at all.  The

defendants' central argument was that the Maine-limited scope of Class One

"circumvent[ed] the statutory cap on damages set forth in the Fair Debt

Collection Practices Act."[3]  Defs.' Mem. in Support of Mot. to Expand Class at 3,

LaRocque ex rel. Spang, No. 2:11-cv-91-DBH (ECF No. 66).  I denied the motion

and held that the Fair Debt Collection Practices Act does not require certification

of a nationwide class.  Dec. on Defs.' Mot. to Expand Class at 4, LaRocque ex rel.

Spang, No. 2:11-cv-91-DBH (ECF No. 74).

---

[2] LaRocque ex rel. Spang v. TRS Recovery Servs., Inc., 285 F.R.D. 139 (D. Me. 2012).
[3] The FDCPA limits statutory damages in class actions to $1,000 per named plaintiff and "such
amount as the court may allow for all other class members . . . not to exceed the lesser of
$500,000 or 1 per centum of the net worth of the debt collector . . . . 15 U.S.C. § 1692k(a)(2)(B).

Thereafter, the Multidistrict Panel transferred here four additional lawsuits from federal courts in California, Kansas, New York, and North Carolina.  Transfer Order (ECF No. 1).  The plaintiffs requested that I certify the four new classes.  I denied that motion because the named plaintiffs were not members of the classes for which certification was requested and, even if they had been, the statute of limitations had run on the named plaintiffs' claims for relief.  Order on Pls.' Consol. Mot. for Certification of Statewide Classes and for Appointment of an Additional Class Representative (ECF No. 55).  At the same time, I granted the unopposed motion to appoint an additional class representative (Melissa Allen) for the existing class for the allegedly misleading and deceptive dunning letter in Maine.  Id.

The parties cross-moved for partial summary judgment on April 14, 2014.  (ECF Nos. 58, 61).  Before either party had filed a response, the parties alerted me that they were engaged in settlement negotiations.

After conducting a fairness hearing on January 21, 2016, as Federal Rule of Civil Procedure 23(e) requires, I **CERTIFY** the settlement classes as proposed.  I also conclude that the settlement is fair, reasonable, and adequate.  I find that the incentive awards are reasonable.  I **APPROVE** payment of Garden City Group's January 20, 2016, invoice for notice and claims administration.  Pls.' Hearing Ex. 2.  I **APPROVE** attorney fees and costs in a total amount of $1,050,000 subject to the reservation in the following sentence, and I delay payment of the fees at this time.  If there is any increase in the expenses of notice and claims administration, it will be subtracted from that $1,050,000, as the plaintiffs' counsel agreed at the hearing.

**CLASS ACTION SETTLEMENT**

*Settlement Class Certification*

Over the defendants' objection, I initially certified three classes in this litigation. The class members did not receive notice of that certification, but they did receive notice of the proposed settlement classes that are before me now for final approval. The parties ask me to certify two settlement classes and a settlement subclass.[4] The major change from the classes I previously certified is that Settlement Class 1 "includes certified classes 1 and 2, merged and expanded by agreement to include natural persons to whom TRS sent a RECR3 letter in any state or territory, regardless of whether any Defendant collected any amount of money from or on behalf of the recipient class member." Mem. of Law in Support of Pls.' Uncontested Mot. for Prelim. Approval of Class Action Settlement and Notice to Class at 6 n.3, (ECF No. 99). Or, put another way, the parties ask me to expand the originally certified Class One from a class of Maine

---

[4] The parties define the classes of consumers covered by the settlement as:

Settlement Class 1: All natural persons with an address in the United States, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, or U.S. Virgin Islands to whom the defendant TRS sent its RECR3 letter between March 11, 2010 and July 30, 2015.

Settlement Class 1 Subclass: All natural persons with an address in the United States, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, or U.S. Virgin Islands to whom the defendant TRS sent its RECR3 letter between March 11, 2010 and July 30, 2015, and from whom one or both Defendants collected in whole or in part, within 30 days of the RECR3 letter, the debt or returned check fee referenced in that RECR3 letter.

Settlement Class 2: All natural persons who have paid a returned check fee of $25 to at least one of the Defendants by way of a TRS demand draft in connection with an underlying check transaction that occurred in the State of Maine between March 11, 2005 and July 30, 2015.

Mot. for Final Approval, Proposed Final Judgment & Order of Dismissal at 3-4 (ECF No. 123-3).

residents to a nationwide class, a request that I previously denied.  See Decision on Defs.' Mot. to Expand Class, No. 2:11-cv-91-DBH (ECF No. 74).

Even though I formerly declined to certify a nationwide Class One, the plaintiffs could appeal that ruling.  Thus, as I recognized in In re New Motor Vehicles Canadian Exp. Antitrust Litig., it was open to TRS and TeleCheck to demand compromise of that nationwide claim (as well as claims for states where I had ruled that the statute of limitations had run) as part of their willingness to settle with the plaintiffs.[5]  269 F.R.D. 80, 88 (D. Me. 2010) aff'd, No. 2:03-MD-1532-DBH, 2012 WL 379947 (D. Me. Feb. 3, 2012).  I proceed, therefore, to examine whether the plaintiffs satisfy the Rule 23 requirements for their proposed expansion of a class of Maine residents to a nationwide class.  Because the First Circuit has not decided that a trial court at certification must make findings by a preponderance of the evidence, I conduct a "searching inquiry into the viability" of the plaintiffs' rationale for certification and evaluate whether facts exist "necessary for the [rationale] to succeed."  Id.; see also Prescott v. Prudential Ins. Co., 729 F. Supp. 2d 357, 365 (D. Me. 2010).

### (a) Rule 23(a)(1) Numerosity

I found previously that the class of Maine residents satisfied the numerosity criterion.[6]  Thus, a nationwide class satisfies that criterion.

---

[5] At a preliminary hearing, the parties told me that the defendants demanded an expansion of previous Class 1 to a nationwide settlement class and that "there [was] no other way this case would ever settle."  Tr. of June 9, 2015 Prelim. Hr'g 39, (ECF No. 107).
[6] LaRocque ex rel. Spang, 285 F.R.D. at 146 (D. Me. 2012).

### (b) *Rule 23(a)(2) Commonality*

The claim for the previous Class One was that TRS's RECR3 letter is "misleading and unlawful" under both federal and Maine statutes.   In my certification of a class of Maine residents, I noted that the defendants' depositions reveal that the RECR3 letter is a form letter and that they have standard and uniform procedures for sending it out.[7]  On this basis, I held that the legality of the "letter's contents and its use presents a common issue." Decision on Mot. for Class Certification at 9, No. 2:11-cv-91-DBH (ECF No. 56). I noted:

> . . . LaRocque's claim is that even with the notices, signed receipts, and consumers' knowledge and understanding at the point-of-sale transaction, use of the RECR3 letter is still contrary to law.   Right or wrong, that narrow claim is a uniform claim that satisfies commonality.   LaRocque also says that her lack of authority claim derives from the fact that TRS—as distinguished from TeleCheck—is never mentioned in the point-of-sale notices and, therefore, that TRS cannot engage in these collection efforts at all.   Oral Argument Tr. 14:12–15:13.   That, too, is a uniform and common issue for the class.   Answering the questions of authority and legality will satisfy <u>Wal–Mart</u>'s commonality requirement.     The final issue—whether mentioning a possible tax while failing to enumerate the *amount* of that tax satisfies the statutory requirement that the debt be correctly stated—likewise satisfies commonality.[8]

Much of that reasoning applies to the proposed nationwide class as well.  On the legal level, there is a common question of whether TRS can engage in collection

---

[7] Deposition testimony related to the RECR3 letter indicates that the standard form letter was sent nationwide, but that specific state requirements were disclosed on the back of the letter:

> Q: Do you know whether or not this letter, this REC[R3] letter is sent to consumers all over the United States?
> A: This letter would be sent if the original amount of the debt had paid and posted and a fee was still due but it would have the applicable state requirements on the back, but similar letters would be sent if they met the criteria.

Hossler Dep. 55:12-62:10, Aug. 24, 2011 (ECF No. 43-5).

[8] <u>LaRocque ex rel. Spang</u> 285 F.R.D. at 147.

efforts, where TRS is not mentioned in the point-of-sale notices.  The issue of alluding to a possible tax, but failing to enumerate the amount of the tax, is also a common question.[9]   There are also non-common questions—specifically, whether individual states permit a debt collector to collect any service charge.[10] However, these questions are not new (previously certified Class Two was also a nationwide class.)   I conclude that common issues predominate for this nationwide class.

### (c) *Rule 23(a)(3) Typicality*

In my certification of the class of Maine residents, I held that LaRocque's claim—that the RECR3 letter, which she received, is itself misleading and deceptive—was typical of the Maine resident class.  That claim is also typical of the nationwide class.

### (d) *Rule 23(a)(4) Adequacy of Representation*

Under this criterion, the inquiry is whether "the representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). Taking into account LaRocque's knowledge of the facts and the law, her age and abilities, her integrity, her willingness to be involved in the case, and the actions she had taken, I previously determined that LaRocque was an adequate representative for the class of Maine residents.  LaRocque ex rel. Spang v. TRS Recovery Servs., Inc., 285 F.R.D. 139, 150 (D. Me. 2012).  Now I must consider

---

[9] At oral argument on the initial certification, I was informed that Texas was perhaps the only state that charges a tax.  LaRocque ex rel. Spang, No. 2:11-cv-91-DBH, Tr. of May 3, 2012 Oral Argument on Mot. for Class Certification at 47:10–12 (ECF No. 55).
[10] The FDCPA prohibits, *inter alia*, a debt collector from collecting any service charge "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

whether LaRocque and the later-added named plaintiff Allen are adequate representatives for a nationwide class.

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) warned of conflicts of interest within a settlement class.  In Amchem, the settlement agreement that the parties devised did "more than simply provide a general recovery fund[;] . . . rather, it ma[de] important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some claimants over others." Id. at 610 (quoting Georgine v. Amchem Prods., 83 F.3d 610, 630 (3d Cir. 1996)).  (In Amchem, an asbestos class action, the named plaintiffs sought to represent currently injured and "exposure only" class members—those who had not yet fallen ill as a result of their exposure—for medical claims resulting from many categories of disease.  Id. at 597-99.)  There, the Court found that the named plaintiffs did not "operate[ ] under a proper understanding of their representational responsibilities" in part as a result of the diversity within categories of plaintiffs and the disparities in recovery between classes of plaintiffs.  Id. at 627.

The settlement agreement here also distinguishes among class members, allowing for greater recovery by some class members.  However, there is significantly less disparity in the character and type of injuries that claimants face in this case than in Amchem.  Here, the named plaintiff (at the very least, LaRocque) is a member of each of the proposed settlement classes.  The plaintiff LaRocque, and now also the plaintiff Allen, continue to function as adequate representatives for each of the settlement classes.  They "possess the same interest[s] and suffer[ed] the same injury" as class members.  Amchem, 521 U.S.

at 625-26.  I conclude that they have fairly and adequately protected the interests of the classes.

### (e)  Rule 23(b)(3) Factors: Predominance and Superiority

The analysis of these factors in my July 17, 2012, certification applies here equally. LaRocque ex rel. Spang v. TRS Recovery Servs., Inc., 285 F.R.D. 139, 153, 155-56, 160 (D. Me. 2012). No more need be said except that the expansion of the class of Maine residents to a nationwide class does not alter the predominance inquiry.  The legality of the RECR3 letter predominates over any question affecting only individual class members. Both predominance and superiority are satisfied.

I conclude, therefore, that certification of the proposed classes is appropriate.  See McMahon v. LVNV Funding, LLC, 807 F.3d 872 (7th Cir. 2015) (reversing district court's refusal to certify a class of persons receiving misleading dunning letters under the Fair Debt Collection Practices Act ).

### Settlement and Plan of Distribution

According to Fed. R. Civ. P. Rule 23(e), the "following procedures apply to a proposed settlement":

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> (4) If the class action was previously certified under rule 23(b)(3), the court may refuse to approve a settlement

> unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
>
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Here, (1) reasonable notice of the settlement has been given (written notice to over 300,000 potential class members, with a 93% reach); (2) there has been a hearing; (3) I have reviewed the agreements made to settle three of the four individual suits transferred to this district;[11] (4) there was no notice of the previously certified classes, but excellent notice of the proposed settlement classes, providing an opportunity to opt out (thirteen people opted out);[12] (5) one potential class member filed a written objection, which was not withdrawn, and no class members except one of the named plaintiffs appeared  at the hearing. What remains, then, is for me to determine whether the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

The First Circuit has stated that "[t]he case law offers 'laundry lists of factors' pertaining to reasonableness, but 'the ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement.'"  Bezdek v. Vibram USA, Inc., 809 F.3d 78, 82 (1st Cir. 2015) (quoting Nat'l Ass'n of Chain Drug Stores v. New England Carpenters, 582 F.3d 30, 44 (1st Cir. 2009)).  I have used the following factors to assess a class settlement:  (1) comparison of the proposed

---

[11] The fourth suit did not settle, and I am informed that the named plaintiff has died.
[12] For privacy reasons, their names are listed only in a sealed filing. (ECF No. 132).

settlement with the likely result of litigation; (2) stage of the litigation and the amount of discovery completed; (3) reaction of the class to the settlement; (4) quality of counsel; (5) conduct of the negotiations; and (6) prospects of the case, including risk, complexity, expense and duration.[13]   See, e.g., Scovil v. FedEx Ground Package Sys., Inc., No. 1:10-CV-515-DBH, 2014 WL 1057079, at *2 (D. Me. Mar. 14, 2014); In re New Motor Vehicles Canadian Export Antitrust Litig., MDL No. 1532, 2011 WL 1398485, *2 & n.16 (D. Me. Apr. 13, 2011) (citing additional sources).

### (a)    Proposed Settlement Compared to the Likely Result of Litigation

As a result of this settlement, the defendants will pay a total of $3,430,000 that will be divided among the class, counsel fees, incentive payments, and administrative costs.  From the settlement fund, approximately $1,864,000 has been earmarked for distribution to the class members.  Not counting the named plaintiffs' incentive payments, individual class members' recoveries are projected to be approximately $20 or $36 or $56, depending on membership in particular classes or subclasses.  There have been 37,418 claims in Settlement Class 1, with 26,859 of those claims also qualifying as members of the Settlement Class 1 Subclass.  There have been 3,091 claims by members in Settlement Class 2. In addition, the defendants have changed the language of the dunning letter to

---

[13] As I have previously observed in In re New Motor Vehicles Canadian Exp. Antitrust Litig., MDL No. 1532, 2011 WL 1398485 at *2 n.16 and in Scovil v. FedEx Ground Package Sys., Inc., No. 1:10-CV-515-DBH, 2014 WL 1057079 at *2 n.1 (D. Me. Mar. 14, 2014), First Circuit case law states that a settlement following adequate discovery and genuine arm's length negotiations is presumed fair.  See also City Partnership Co. v. Atlantic Acquisition Ltd. Partnership., 100 F.3d 1041, 1043 (1st Cir. 1996); Adoma v. University of Phoenix, Inc., 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012).  But that presumption is heavily criticized, and it is not of use to me here.  See Principles of Aggregate Litigation § 3.05(c) and cmt. c (critique of presumption of fairness).

meet the plaintiffs' challenges, and the class members are not required to surrender other unrelated claims they might have against the defendants for their check collection practices.

For a class action verdict favorable to the plaintiffs, the Fair Debt Collection Practices Act allows recovery of any actual damages sustained by the consumers (losses associated with the purported overshadowing[14] and the returned check fee), statutory damages in the court's discretion, and reasonable attorney fees and costs as determined by the court, assessed under a lodestar calculation. The statutory damages are capped at $1,000 for each named plaintiff and $500,000 for the class, and there is no guarantee that a court will award statutory damages even if liability is established. 15 U.S.C. § 1692k.[15] Below, I discuss how the amount of potential recovery here should be discounted for risk, delay, and expense, and whether a positive result was "likely" for the plaintiff classes.

### (b) Stage at Which the Lawsuit Settled and the Amount of Discovery

LaRocque filed suit almost five years ago. <u>LaRocque v. TRS Recovery Servs., Inc., et al.</u>, No. 2:11-cv-91-DBH (D. Me. Mar. 11, 2011) (ECF No. 1). Since that time, there have been contested motions on discovery, class certification,

---

[14] When a debt collector seeks to collect from a consumer, the FDCA requires that the collector issue a validation notice informing a consumer of her rights and obligations and other specific information spelled out at 15 U.S.C. § 1692g(a). The "notice overshadows or contradicts the validation notice if it would make the least sophisticated consumer uncertain as to her rights." <u>LaRocque ex rel. Spang</u>, 285 F.R.D. at 149 (quoting <u>Jacobson v. Healthcare Fin. Servs., Inc.</u>, 516 F.3d 85, 90 (2d Cir. 2008) (quotation marks omitted).

[15] There is also a cap of 1 percent of a defendant's net worth if that amount is lower than the $500,000 cap. 15 U.S.C. § 1692k. Punitive damages are available for "willful noncompliance" with the Fair Credit Reporting Act, 42 U.S.C. § 1681n, but the focus of this lawsuit has always been the Fair Debt Collection Practices Act, not the Fair Credit Reporting Act, and no classes were certified for any claims under the latter.

and cross motions for summary judgment.  The parties have exchanged multiple sets of interrogatories and responses and produced thousands of pages of documents.  Pls.' Uncontested Mot. for Prelim. Approval of Class Action Settlement ("Pls.' Mot.") at 4 (ECF No. 99).  Both parties took depositions and participated in expert witness discovery.  Id. at 4-5.  They proceeded to mediation before a retired administrative justice of the Business Litigation Session of the Massachusetts Superior Court.  Id. at 5.  That mediation did not result in this settlement agreement.  Id.  The parties resumed negotiations, this time without the assistance of a mediator, and those talks resulted in this settlement.  Id.  Thus, the settlement occurred at a late stage of the litigation and after much investigation of its merits and risks, a positive factor.

### (c) Class Reaction

In an effort to measure the class's reaction to the settlement's terms, courts have considered "the number and vociferousness of the objectors."  In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 812 (3d Cir. 1995).  Here, there was one pro forma written objection,[16] and no

---

[16] The objector furnished no basis to conclude that he is even a class member.  The defendants have the names of all the class members except those who conducted a transaction in Maine and paid a returned check fee but did not receive the RECR3 letter.  The objector lives in Wisconsin, does not assert that he ever conducted such a transaction in Maine, and does not claim membership in the Maine class (Class 2).  Thus, he should be included in the defendants' database (he is not).  Moreover, his claim to membership is based only "on belief."  Obj. to Proposed Settlement Agreement at 1 (ECF No. 121).  His listed objections are without merit and appear to be a form document, id. at 2-3, that he has filed in other class action settlements.  See In re Polyurethane Foam Antitrust Litig., No. 10-md-2196, (N.D. Ohio Nov. 17, 2015) (Obj. of Patrick Sweeney (ECF No. 1968)); see also Roberts v. Electrolux Home Prods., Inc., 2014 WL 4568632, at *12-15 (C.D. Cal. Sep. 11, 2014) (overruling Patrick Sweeney's objections and noting his "long history of representing objectors"); Larson v. Trader Joe's Co., 2014 WL 3404531, at *6-7 & n.4 (N.D. Cal. July 11, 2014) (overruling objections and recognizing that "attorney Patrick Sweeney also has a long history of representing objectors in class action proceedings").  His objection is **OVERRULED**.

class member appeared at the hearing to object.  Thirteen people opted out of the classes, and 39,875 submitted claims, an approximately 11.5% to 12.7% claims rate, according to the class or subclass.  Pls.' Mot. at 7 & Tr. of Final Fairness Hr'g at 7, 27 (Jan. 21, 2016).  CAFA notices also went to the United States Attorney General and 95 state officials (including state attorneys general), (ECF No. 104), but none appeared in the litigation.

The "practical realities" of small-dollar recoveries in consumer class actions suggest caution in inferring support from the absence of objectors.  See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 318 (3d Cir. 1998); Scovil, 2014 WL 1057079 at *3.  First, while courts have generally understood "silence" to "constitute[ ] tacit consent to the [settlement] agreement," Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993), in a consumer class action such as this one, potential objectors have less incentive to contest an "unpalatable" settlement agreement because the costs of contesting the settlement far exceed the objector's pro rata benefit.  Id.  Second, members of a class who, as in this case, receive notice of the class action and notice of the settlement at the same time, "are presented with what looks like a fait accompli."  Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago, 834 F.2d 677, 681 (7th Cir. 1987).  But while those "practical realities" counsel against drawing too strong an inference from the lack of objections, certainly the extremely low level of objections and exclusions in this case is not a negative factor and is mildly positive.

14

### (d) Quality of Representation

As I noted in my Order initially certifying the classes,[17] the plaintiffs' Philadelphia lawyers have pursued this action since its early stages and have significant experience in class action lawsuits.  They are particularly well-versed in the laws of debt collection.  Likewise, local counsel have extensive experience in class actions, including in front of this court.  I observed the lawyers' performance in written arguments and in-person appearances.  The lawyers— prepared and effective advocates—consistently confirmed my confidence in their abilities.  I conclude that the plaintiffs' attorneys satisfy the requirements of Rule 23(g) and fairly and adequately represented the interests of the class.

### (e) Conduct of the Settlement Negotiations

The negotiations went on for more than a year and included two separate in-person mediation sessions and subsequent telephone negotiations.  The parties persuaded this District's magistrate judge to first postpone and then stay the deadline for the parties' oppositions to the motions for summary judgment, as well as the plaintiffs' response to the defendants' Daubert motion, while they pursued settlement.  The parties repeatedly requested and received an extension of the deadline by which they were to move for preliminary review and determination of whether to issue notice.  The parties assert, the mediator confirms (Decl. of the Hon. Margaret R. Hinkle 1-2 (ECF No. 123)), and my personal observations support the conclusion that the negotiations were prolonged and conducted at arm's length.

---

[17] LaRocque ex rel. Spang v. TRS Recovery Servs., Inc., 285 F.R.D. 139, 148-49 (D. Me. 2012).

### *(f)  Case Prospects—Including Risk, Complexity, Expense and Duration*

This factor is at the core of whether the settlement is fair, reasonable, and adequate.  The recovery for individual plaintiffs is small.  However, the parties' cross-claims for summary judgment reveal a number of contested issues—which presented litigation risks to both parties—including whether the RECR3 letter was misleading, whether the defendants' collection efforts overshadowed debtors' validation rights, and whether the class members had actually suffered a loss of money or property.

Similarly, the plaintiffs faced an uphill battle on the issue of damages.  The FDCPA provides for a maximum of $500,000 in statutory damages, an amount far exceeded by the parties' settlement.  The class also sought actual damages. But it is not obvious that the plaintiffs suffered compensable damages.

I conclude that the overall settlement amount is fair, reasonable and adequate.  I also conclude that the distribution plan meets those criteria.  Those who received only the allegedly offending letter and paid no check fee will receive $20 each; those who paid a check fee but never received the letter will receive $36 each; those who both received the letter and paid a check fee will receive $56 each.  This is close to 100% of what class members reasonably could have claimed as actual damages.

### *Attorney Fees*

The settlement agreement provides that the plaintiffs' lawyers will ask the Court to award them $1,050,000 out of the settlement fund.  They have done so by motion, and I heard the motion at the final fairness hearing on January 21, 2016.   The amount requested will cover their fees, as well as costs and

16

disbursements.[18]  Costs and disbursements now stand at $72,776.61, leaving a net fee award of $977,223.39, approximately 29% of the total settlement.  At the fairness hearing, the plaintiffs' lawyers also told me that the $1,050,000 will include any amounts by which the costs of administering the settlement, including the distribution of checks to class members, exceed the latest invoice from the third-party claims administrator.

Federal Rule of Civil Procedure 23(h) governs the award of attorney fees in class actions.  It provides that a court may award costs and reasonable attorney fees, that class members or a party may object to the request for attorney fees, that a court may hold a hearing, and that a court "must find the facts and state its legal conclusions under Rule 52(a)."  I held a hearing on the fee request at the final fairness hearing on January 21, 2016.  Only one person objected to the requested fees, and he did not appear at the hearing.  I proceed to the findings of fact and conclusions of law on whether the request is reasonable.

Had this lawsuit proceeded to a successful judgment for the plaintiffs, they could have recovered from the defendants reasonable attorney fees and costs under the FDCPA, section 1692k, on top of any damages they received.[19]

---

[18] There was some confusion on this in the motion papers, but the plaintiffs' counsel cleared up the confusion at the fairness hearing.

[19] Had this case proceeded to judgment, I would have to use the lodestar in assessing any fee award against the defendants TRS and TeleCheck, as this is the preferred method in fee-shifting cases, and a "court shuns this tried-and-true approach at its peril."  Nilsen v. York Cnty., 400 F. Supp. 2d 266, 270 n.12 (D. Me. 2005); see also Coutin v. Young & Rubicam Puerto Rico, Inc., 124 F.3d 331, 337 (1st Cir. 1997); Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992) (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). However, generally the circuits have agreed that common fund principles govern where a fee-shifting case settles in advance of judgment.  See Staton v. Boeing Co., 327 F.3d 938, 967–68 (9th Cir. 2003); Brytus v. Spang & Co., 203 F.3d 238, 246–47 (3d Cir. 2000); Florin v. Nationsbank, 34 F.3d 560, 564 (7th Cir. 1994); Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1327 (2d Cir. 1990); see also Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation 75, 69 (Federal Judicial Center,

Instead, TRS and TeleCheck settled the lawsuit before trial for a total of $3,430,000, covering all their liabilities, including attorney fees.[20]  Settlement Agreement ¶ 1.1(v) (ECF No. 99-2).  Lawyers for the class then have a right to seek payment from the resulting common fund.  See Nilsen v. York Cnty., 400 F. Supp. 2d 266, 269 (D. Me. 2005) (collecting cases).

Deciding on an appropriate fee award from a common fund in a class action settlement, as I have noted previously, is a difficult task.  See Nilsen, 400 F. Supp. 2d at 270.  In a class action settlement, as here, there is no adversarial presentation to test the claim for attorney fees.  Instead, I must depend upon my own analysis and secondary research—"against a backdrop of popular dissatisfaction with large and highly publicized fees."  Id.; see also Third Circuit Task Force Report, Selection of Class Counsel, 208 F.R.D. 340, 343-44 (2002) ("[T]here is a perception among a significant part of the non-lawyer population . . . that class action plaintiffs' lawyers are overcompensated for the work that they do.").

The First Circuit does not require that I employ a lodestar analysis in a class action settlement.  Instead, I use a percentage-of-funds approach to evaluate the attorney fees.  In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995).  I have previously relied on the Seventh Circuit's market-mimicking approach to determine what is

---

2d ed. (2005)) (stating that, "a common fund award is not necessarily precluded in such a case," and "[n]o courts have held to the contrary").

[20] Case law and commentators have acknowledged that the threat of fee-shifting may contribute to the size of the fund at settlement.  See Nilsen, 400 F. Supp. 2d at 287; Stephen J. Safranek, Curbing the Fees of the Class Action Lawyers in Light of City of Burlington, 41 Wayne L. Rev. 1301, 1306 (1995) ("The fund [at settlement] is so sizeable only because of the threat of statutory attorney fees.").

a reasonable fee, <u>Nilsen</u>, 400 F. Supp. 2d at 266; <u>Scovil</u>, 2014 WL 1057079, at
*5, and I follow that approach here.  In following the market-mimicking approach
in other cases, I have considered whether representative plaintiffs actually
engaged class counsel to represent them on a contingent fee basis, as they did
here.  Mot. for Attorneys' fees at 7 (ECF No. 124).  I have taken judicial notice
that contingent fees of one-third are common, and I have evaluated whether the
proposed fee is consistent with like settlements in neighboring jurisdictions.
<u>Scovil</u>, 2014 WL 1057079 at *5.

On considering awards in similar cases, I look to cases of like size, rather
than like subject matter.[21]  In the First Circuit, courts typically award attorney
fees "in the range of 20–30%, with 25% as 'the benchmark.'"  <u>Latorraca v.
Centennial Techs., Inc.</u>, 834 F. Supp. 2d 25, 27–28 (D. Mass. 2011) (collecting
cases).[22]  Cases involving comparable common funds to the $3,430,000
settlement fund here have resulted in awards of attorneys' fees in the ranges of
25% to 30% of the fund.  See <u>Trombley v. Bank of Am. Corp.</u>, No. 08-CV-456-
JD, 2013 WL 5153503, at *8 (D.R.I. Sept. 12, 2013) (30% of the fund awarded,
where the fund was $4 million); <u>Kingsborough v. Sprint Commc'ns Co., L.P.</u>, No.
14-12049-NMG, 2015 WL 1605506, at *2 (D. Mass. Apr. 8, 2015) (25% of the
fund awarded, where the fund was estimated to be $2.39 million); <u>In re Textron,
Inc. ERISA Litig.</u>, No. 09-383-ML, 2014 WL 576139, at *1 (D.R.I. Feb. 12, 2014)
(30% of the fund awarded, where the fund was $4.375 million); <u>Boyajian v.

---

[21] <u>Singleton v. Domino's Pizza, LLC</u>, 976 F. Supp. 2d 665, 685 (D. Md. 2013).  Comparing the fee
award to "like settlements" would be impractical if I considered only FDCPA settlements.
[22] <u>See also</u> Theodore Eisenberg & Geoffrey P. Miller, <u>Attorney Fees and Expenses in Class Action
Settlements: 1993–2008</u>, 7 J. Emp. L. Studies 248, 265 T.7 (June 2010).

California Products Corp., No. 10-CV-11849-rwz, 2013 WL 3828804, at *2 (D. Mass. July 9, 2013) (30% of the fund awarded, where the fund was $1.925 million).

I conclude therefore that the award requested here satisfies the market-mimicking approach and is reasonable, and I approve the requested attorney fee award,[23] but I **ORDER** that payment be delayed until I see the outcome of the claims payment process.

### *Incentive or Service Awards*

A named plaintiff is a necessary component of any class action, and thus, an incentive or service award may be appropriate to induce an individual to take part in the suit.  See Scovil, 2014 WL 1057079 at *6 (citing Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir.1998)).  In determining whether an incentive award is called for, courts consider the actions the named plaintiffs have taken to protect the interests of the class, the amount of time and effort they have expended in pursing the litigation, the degree to which the class has benefited from the named plaintiffs' efforts, Scovil, 2014 WL 1057079, at *6, and any negative effects they have risked.

The settlement proposes a $6,000 fee award for LaRocque and a $4,000 fee award for Allen.[24]  No class member objected to the awards.

---

[23] The award is well below the amount the lawyers would be able to request under the lodestar analysis.  See Decl. of Jon Hinck 4 (ECF No. 125) & Decl. of James A. Francis 5 (ECF No. 126) (totaling 2,803 billable hours and a total fee rate of $1,270,013.75).  (I corrected that number to account for some mathematical errors in the calculations as submitted, errors that resulted in understating the amount of the lodestar fees.)

[24] An analysis of incentive payments between 1993 and 2002 (374 cases) found that the median incentive payment then was $4,357, and the average was $15,992.  Theodore Eisenberg & Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1308 (2006).

The plaintiff LaRocque and the person who possessed her power of attorney spent several hours collecting documents, consulting with counsel in responding to interrogatories, and preparing for and participating in hours of depositions.  Pls.' Mot. for Attorneys' Fees at 12.  The plaintiff Allen also spent considerable time collecting and reviewing documents with counsel, consulting with counsel in responding to interrogatories, and participating in a full-day deposition.  Id.

I conclude that the awards are reasonable given the named plaintiffs' time and energy commitment, and in comparison to other awards in similar circumstances.

### CONCLUSION

There is no reasonable basis to believe that the plaintiff classes can achieve a higher settlement amount, and there are significant risks posed by continued litigation—including risks posed by summary judgment.  I therefore finally **CERTIFY** the classes, and **APPROVE** the settlement agreement and plan of distribution, including the service awards to the two named plaintiffs.  I also **APPROVE** an award of attorney fees but **ORDER** that payment of attorney fees be delayed pending the administration of payments to the class members.

**SO ORDERED.**

**DATED THIS 10TH DAY OF FEBRUARY, 2016**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**